UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DEMARCUS ROWE,

    Plaintiff,

v.                                            Case No. 2:08-cv-162
                                            HON. ROBERT HOLMES BELL
DAVID BERGH, et al.,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Demarcus Rowe, an inmate currently confined at the Alger Maximum Correctional Facility (LMF), filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Warden David Bergh, Corrections Officer Unknown Sego, Resident Unit Manager Denver McBurney, Sergeant Unknown Tenuta, Assistant Resident Unit Supervisor Peggy Ann Carberry, Resident Unit Officer Unknown Warzak, and Unknown Dolinski, R.N.

Plaintiff's complaint alleges that on September 28, 2007, Defendant Sego and Resident Unit Officer Peterson came to his cell to request a shakedown. Plaintiff stated that he had received a shakedown earlier that day and refused to allow a second shakedown. Shortly thereafter, Defendant Sego, Resident Unit Officer Peterson and Defendant Tenuta returned to Plaintiff's cell. Plaintiff explained the situation to Defendant Tenuta, who responded by telling Plaintiff to "cuff up" and come out of his cell, "or else." Plaintiff states that he believed this to be a threat and feared for his safety. Plaintiff told Defendant Tenuta that he would come out, but that he planned to write a grievance. Defendant Tenuta indicated that he did not care, because he would be the one to respond to the grievance. Plaintiff then stated that he would include Defendant Tenuta in the grievance. At

this point, Defendant Tenuta became red in the face and ordered Plaintiff to cuff up and come out of his cell. In addition, Defendant Tenuta stated that he would "mess [Plaintiff] up."

Plaintiff alleges that his hands were cuffed behind his back and that Defendant Sego began to pat Plaintiff down. Defendant Tenuta instructed Plaintiff not to look at him, but Plaintiff kept staring at Defendant Tenuta. At this point, Defendant Sego placed both his hands on Plaintiff's shoulders and twisted Plaintiff's body away from Defendant Tenuta. Plaintiff turned to look at Defendant Sego. Defendant Tenuta then grabbed Plaintiff by the back of the neck and squeezed, causing Plaintiff to gag. Defendant Tenuta pushed Plaintiff's shoulder and side of face into the metal door frame, causing him to feel pain. Plaintiff claims that he sustained several marks on his face and a bruised and swollen right shoulder and wrist. Defendant McBurney approached the scene and grabbed Plaintiff's head, forcing Plaintiff's head down to waist level. Defendants Tenuta and Sego then grabbed Plaintiff's cuffed arms and pulled him to the B-Wing shower.

Plaintiff alleges that on November 1, 2007, he asked Defendant Carberry for legal supplies, but she refused, stating "McBurney says you get nothing until you drop the grievances." On November 29, 2007, while waiting to go to a medical appointment, Plaintiff was placed in the A-wing shower and strip searched by Corrections Officer Tallman. During the search, Defendant Carberry told Tallman, who is female, to see if she could get Plaintiff to show her his "dick."

On December 4, 2007, Defendant Carberry refused to notarize any affidavits for Plaintiff unless he showed her his penis. Plaintiff states that each time he filed a grievance on Defendant Carberry, she lied to the interviewer, stating that she had not given Plaintiff supplies because he had been masturbating when she made rounds. On April 4, 2008, Defendant Carberry refused to give Plaintiff legal supplies because of a ticket he had received in March.

On April 14, 2008, Plaintiff stuck his arm in the food slot of his cell and told Defendant Warzak that he was going to overdose on 100 aspirin and showed Defendant Warzak the bottle. Defendant Dolinski was making rounds at the time and asked what was going on. Plaintiff started taking the aspirin and showed Defendant Dolinski the half full bottle. Plaintiff then took the rest of the aspirin in front of Defendant Dolinski. Plaintiff subsequently sought medical attention and was told by Defendant Tenuta that he would have to remove his arm from the food slot first. Plaintiff pulled his arm out of the slot, after which Defendant Tenuta told Plaintiff that he was not "getting shit." Plaintiff then told Defendants that he needed to be taken to the hospital, but Defendant Dolinski told Plaintiff that he had not seen Plaintiff take anything. Plaintiff became sick and dizzy and eventually began to vomit repeatedly. Plaintiff asked Corrections Officer Barnett to call the nurse and Nurse Galloway was summoned. Plaintiff did not tell Nurse Galloway about the aspirin, as he assumed she already knew that he had taken them. Nurse Galloway told Plaintiff not to eat or drink for three hours and ordered a liquid diet for Plaintiff. Plaintiff subsequently began to vomit blood. Plaintiff continued to vomit blood into the next day. After the incident, Plaintiff maintains he suffered from constant ringing in his ears, a stuffy nose, indigestion, and coughed up blood clots. Plaintiff was finally seen by the doctor on July 3, 2008. The doctor told Plaintiff that he suffered from high blood pressure and was placing him on medication which would eventually kill his liver, kidney, heart, and brain.

On April 20, 2008, Plaintiff sent a kite to Defendant McBurney complaining about Defendant Carberry's refusal to give him legal supplies. On April 24, 2008, Resident Unit Officers Bone and Wilkins spent 40 minutes shaking down Plaintiff's cell, during which Plaintiff was placed in the shower on A-wing. While Plaintiff was in the shower, Resident Unit Officer Peterson told Plaintiff that he should leave "the boss lady" alone. When Plaintiff was returned to his cell, Resident

Unit Officer Bone told Plaintiff that they had been looking for evidence of something to do with Defendant Carberry. Plaintiff states that everything in his cell had been searched and that all his papers and belongings were in a mess on the floor.

On June 2, 2008, Plaintiff was moved to an isolation cell on D-wing. This cell is called the peep hole cell or the monkey cell and is used for inmates who continuously receive sexual misconduct tickets and cannot be controlled under the normal procedures. Plaintiff claims that his placement in this cell was done in order to separate him from other prisoners who might help him and that it violated his due process rights. Plaintiff also states that he was placed in isolation as a result of his "constant litigating" and grievances directed toward the Defendants. Plaintiff alleges that on June 19, 2008, he was told by Assistant Deputy Warden Rutter that "until someone makes us or we want to let you out your [sic] in that cell." Plaintiff states that he has been gravely affected by the misconduct of Defendants and has attempted to commit suicide three times while incarcerated at LMF. Plaintiff claims that Defendants' conduct violated his rights under the First, Eighth and Fourteenth Amendments and seeks compensatory and punitive damages, as well as injunctive relief.

On September 9, 2008, all of Plaintiff's claims were dismissed on initial screening, with the exception of Plaintiff's Eighth Amendment claims against Defendants Tenuta, Warzak, and Dolinski regarding the denial of medical care. (Docket #4 and #5.) Presently before the Court is the Motion for Summary Judgment filed by Defendants Tenuta, Warzak, and Dolinski, pursuant to Fed. R. Civ. P. 56. Plaintiff has filed a response and the matter is ready for decision. Summary judgment is appropriate only if the moving party establishes that there is no genuine issue of material fact for trial and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). If the movant carries the burden of showing there is an absence of evidence to support a claim or defense, then the party opposing the motion must

demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Id.* at 324-25. The nonmoving party cannot rest on its pleadings but must present "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The evidence must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true. *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004) (*citing Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994)). However, a mere scintilla of evidence in support of the nonmovant's position will be insufficient. *Anderson*, 477 U.S. at 251-52. Ultimately, the court must determine whether there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. *See also Leahy v. Trans Jones, Inc.*, 996 F.2d 136, 139 (6th Cir. 1993) (single affidavit, in presence of other evidence to the contrary, failed to present genuine issue of fact); *cf. Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1448 (6th Cir. 1993) (single affidavit concerning state of mind created factual issue).

Defendants state that they are entitled to summary judgment because they were not deliberately indifferent to Plaintiff's suicide attempt. Moreover, Defendants assert that the evidence does not support Plaintiff's claim that he swallowed an entire bottle of aspirin. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In

> order to state a cognizable claim, a prisoner must allege acts or
> omissions sufficiently harmful to evidence deliberate indifference to
> serious medical needs.

*Estelle*, 429 U.S. at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer*, 62 F.3d at 154-55; *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). Where, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998).

Defendants offer their affidavits in support of their assertion that they were not deliberately indifferent. Defendant Warzak attests that at approximately 3:54 p.m. on April 14, 2008, Plaintiff took control of his upper door slot during meal rounds and refused to remove his arm from the slot so that it could be secured. Defendant Warzak attests that Plaintiff made no statements to him about taking pills or attempting suicide. Approximately one hour later, Defendant Warzak

noted that Plaintiff had his cell door window covered and that he had something around his neck and tied to the rear window bars. Defendant Warzak then contacted his supervisor. (Defendants' Exhibit A.)

In his affidavit, Defendant Tenuta attests that at 4 p.m. on April 14, 2008, he went to Plaintiff's cell because Plaintiff was refusing to relinquish control of his upper door slot so that staff could close and secure the slot. At this time, Defendant Dolinski left Plaintiff's cell front. Defendant Tenuta ordered Plaintiff to pull his arm out of the slot. Plaintiff demanded medical attention. Defendant Tenuta told Plaintiff that Defendant Dolinski had just left his cell front. Plaintiff then pulled his arm from the slot and Defendant Tenuta secured the slot and left the wing. Defendant Tenuta denies ever refusing Plaintiff's request for medical care. At approximately 4:54 p.m., Defendant Tenuta was informed that Plaintiff had his door window covered and that there was something around Plaintiff's neck which was tied to the rear window bars. Defendant Tenuta immediately ordered that preparations be made to cut Plaintiff down and was at Plaintiff's cell by 4:58 p.m., along with other staff. Defendant Tenuta discovered that Plaintiff had not hanged himself and by 4:59 p.m., Plaintiff was removed from his cell and secured in the A-wing shower. Defendant Dolinski was in the unit by 5:01 p.m. and evaluated Plaintiff, but found no medical ailments. (Defendants' Exhibit B.)

In his affidavit, Defendant Dolinski attests that he did rounds at approximately 3:45 p.m. on April 14, 2008, and that Plaintiff stated he did not feel well, but did not want to talk about it. By 5:05 p.m., Defendant Dolinski was called back to the unit to see Plaintiff. Plaintiff was sitting on his bunk with a sheet tied around his neck and to the bars of his window. Plaintiff had not hanged himself, but stated that he did not want to live and wanted to go to Marquette. Plaintiff also told Defendant Dolinski that he had taken pills, and when Defendant Dolinski asked why he had his

empty bottle in his room, Plaintiff stated that he was using it for a drinking glass. Defendant Dolinski states that Plaintiff later admitted that he had not taken any pills, but merely wanted to go to Marquette. Plaintiff was removed from his cell and examined. Plaintiff's vital signs were normal, and he showed no signs of aspirin overdose. Plaintiff denied any nausea, vomiting or stomach pain and repeated that he wanted to go to Marquette to the prison. Plaintiff was placed on suicidal observation in the Cedar Unit and Psychological Services staff saw Plaintiff on April 15, 17, 18, and 24, 2008. Plaintiff never mentioned taking too many aspirin during any of his visits with Psychological Services. Nor did Plaintiff mention taking too many aspirin during his Nurse visits on April 14, 16, or 17, 2008. (Defendants' Exhibit C.)

Defendants offer excerpts from Plaintiff's medical records in support of their motion for summary judgment. According to the April 14, 2008, SOAP Note Summary Defendant Dolinsky evaluated Plaintiff and found him to be alert, oriented, with pupils equal, round and reactive to light. Plaintiff exhibited good grips, and showed no marks or redness to his neck. No respiratory distress was noted and his vital signs were normal, as was his lung sounds. Plaintiff told Defendant Dolinsky that he did not want to live and wanted to go to Marquette. (Defendants' Exhibit D, p. 8.) Plaintiff was referred to Mental Health Services. (Defendants' Exhibit D, p. 9.)

On April 14, 2008, at approximately 11:07 p.m., Plaintiff was examined by Mary Rose Galloway, R.N. Plaintiff complained that he had thrown up 3 to 4 times and felt like he was wheezing. Plaintiff was evaluated and did not appear to be in acute distress. Plaintiff was advised to avoid food for three hours, and then to resume small sips of water. Ms. Galloway also stated:

> PATIENT IS IN OBSERVATION CELL WITH CONT. CAMERA. THIS WRITER OBSERVED HIM IN CELL FOR AT LEAST 10 [MINUTES] PRIOR TO HIM COMING TO EXAM ROOM DRESSED ONLY IN UNDERSHORTS, HE SAT ON HIS BUNK, AMB. SEVERAL TIMES TO HIS CELL DOOR, STANDING

> WITH ERECT POSTURE FOR FEW MINUTES AND THEN
> BACK TO BUNK. TOILET CONTAINS ONLY CLEAR WATER.
> NO SIGNS OF RESP. DIFF., VOMITING OR ANY OBVIOUS
> DISTRESS DURING THIS OBSERVATION.

(Defendants' Exhibit D, p. 10.)

On April 15, 2008, Psychologist Paul A. Eyke, M.S., evaluated Plaintiff's suicide risk and determined that his level of risk was moderate. Plaintiff did not report taking an overdose of aspirin during this evaluation. (Defendants' Exhibit D, pp. 11-12.) A mental health management plan was formed which called for Plaintiff to remain in a strip cell, with a protective mat / gown, finger foods, razor restrictions and unit dose medications. In addition, Plaintiff was to be observed every 15 minutes and any threat or attempt at self-harm was to be reported, as was any increase in agitation. Plaintiff was to be reevaluated by a qualified mental health provider every other business day. (Defendants' Exhibit D, p. 13.)

On April 16, 2008, Darla R. Kroupa, R.N., examined Plaintiff and found him to be calm and cooperative. Plaintiff denied any thoughts of self-harm or suicide. (Defendants' Exhibit D, p. 16.) On April 16, 2008, Psychologist Eyke evaluated Plaintiff and found his suicide risk to be intermediate. Eyke noted that Plaintiff claimed that he had taken an overdose of aspirin in front of staff to get health services to see him, but was denied access to health care. Plaintiff told Eyke that the attempt at hanging was finally successful in getting an R.N. to see him. Plaintiff complained that he was sick as a result of the overdose, denied any genuine desire to harm himself, and asked to be returned to routine handling. (Defendants' Exhibit D, p. 19-20.)

On April 17, 2008, Roberta Clark, R.N., observed Plaintiff, who denied any suicidal ideations. (Defendants' Exhibit D, p. 23.) On April 18, 2008, Psychologist Eyke saw Plaintiff at his cell front as part of routine follow-up for suicide prevention precautions. Eyke noted that when

he arrived at the cell, Plaintiff was in the process of fishing something from another inmate and appeared to be in no acute distress. Plaintiff denied any desire to harm himself. (Defendants' Exhibit D, p. 24.) On April 24, 2008, Plaintiff was again seen by Psychologist Eyke, who observed no indication of mental disorder. Plaintiff denied any desire to harm himself. (Defendants' Exhibit D, p. 26.) On April 30, 2008, Plaintiff complained of pain in his left side and burning in his stomach, which he asserted was from taking an overdose of medication on April 14, 2008, in front of Defendant Dolinski, who refused to provide treatment. R.N. Galloway responded to Plaintiff's kite by stating that she had seen him on April 14, 2008, and that he had never said anything about an overdose, despite the fact that Plaintiff was well aware of the actions taken by Galloway for an overdose. R.N. Galloway also noted that Plaintiff had been seen by nurses twice on April 16 and once on April 17, without ever mentioning the alleged overdose. R.N. Galloway further stated that Plaintiff had been seen by Psych on April 15, 17, 18, and 24, with no mention of an overdose. Plaintiff was scheduled for an evaluation of his complaints. (Defendants' Exhibit D, p. 28.) On May 6, 2008, Plaintiff was seen by Psychologist Eyke, and asked if he could get any pamphlets on managing anger. Plaintiff did not display any symptoms of mental disorder and denied a desire to harm himself. (Defendants' Exhibit D, p. 31-32.)

In the opinion of the undersigned, Defendants have succeeded in showing that Plaintiff received ample medical and psychological attention following his suicide attempt on April 14, 2008. In addition, the medical record does not support a finding that Plaintiff actually took an overdose of aspirin. Rather, the evidence shows that Plaintiff lied about this action several days later in order to obtain medical and psychological attention. Consequently, the undersigned recommends that Defendants be granted summary judgment.

Defendants alternatively move for qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 816. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id*. As previously discussed, because plaintiff cannot establish that his constitutional rights were violated, defendants are entitled to qualified immunity.

In summary, in the opinion of the undersigned, Plaintiff has failed to sustain his burden of proof in response to Defendants' Motion for Summary Judgment. Accordingly, it is recommended that Defendants' Motion for Summary Judgment (Docket #28) be granted and this case be dismissed in its entirety.

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal. Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $455 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455 appellate filing fee in one lump sum.

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

      /s/ Timothy P. Greeley
      TIMOTHY P. GREELEY
      UNITED STATES MAGISTRATE JUDGE

Dated: August 24, 2009